Charles Talbert
No. QA4727
SCI. Forest
289 Woodland Drive
Marienville, PA. 16239                     August 30, 2023

George Wylesol, Clerk
U.S. Courthouse- East
Room 2609
601 Market Street
Philadelphia, PA. 19106

    Re: Talbert v. Beal Bank USA, et al, No. 23-cv-2147-MAK

Dear Mr. Wylesol:
    Enclosed herein, please find my Amended Complaint which is due to be filed by September 5, 2023. Thank you!

                          Yours Truly,

                          Charles P.E. Talbert
                          Legal Assistant - Paralegal

United States District Court for the Eastern District of Pennsylvania

Charles Talbert

vs.                                          No. 23-cv-2147-MAK

Beal Bank USA

Mr. David Cortez                    Amended Complaint

Parties:

1. Plaintiff, is an adult individual, and citizen of the United States.
2. Beal Bank USA (BBU), is a private bank, specialized in offering competitive rates on certificates of deposit, money market accounts, statement savings accounts, and individual retirement accounts.
3. Mr. David Cortez (Cortez), is one of BBU's Assistant Managers, assigned to the BBU located at 150 Allendale Road, Building No. 3, Suite 3000, King of Prussia, Pennsylvania 19406.

Statement of Facts:

4. The BBU is a commercial bank that provides a wide range of financial services, both to the general public and to firms.
5. Its principal activities are operating current accounts, receiving deposits, taking in and paying out notes, and making loans.
6. Additional services include trustee and executor facilities, the supply of foreign currency, the purchase and sale of securities, insurance, a credit-card system, and personal pensions.

7. The BBU also competes with the merchant banks by providing venture capital and trading on the financial markets.
8. The BBU is a member of the Federal Deposit Insurance Corporation (FDIC), to which receives deposit insurance, therefrom, against loss of deposits by a customer in case it fails.
9. As a registered corporation in Pennsylvania, pursuant to 15 PA. Cons. Stat. Ann., subsections 2501 - 2588, it is identified as a business corporation with shares registered under the Securities Exchange Act of 1934.
10. Under the Securities Exchange Act of 1934, which is Federal legislation regulating financial markets, the BBU is prohibited from acts of fraud and deception in the purchase and sale of securities.
11. In addition, by being registered with the Securities and Exchange Commission, the BBU is required to comply with Federal laws.
12. The BBU advertises and markets its business services and activities online and in the Philadelphia Inquirer.
13. In between 2022 and 2023, its online statement savings account advertisement states that "to ensure that the (greatest number) of customers can benefit from our high rates, Beal Bank USA limits aggregate deposit balances to $1 million per tax identification number."
14. Even though the BBU's statement savings account advertisement online seems to be facially neutral, the "greatest number" of it's customers receiving statement savings accounts from them are white citizens, resulting in a racial disparity.
15. In BBU's advertisement in the Philadelphia Inquirer, it induced those intrigued by its statement savings interest rates to part with their money and identification, as a marketing scheme

to surreptitiously provide these accounts disproportionately to white citizens upon being able to see their picture identification cards to tell what color and race they were.

16. As a result of this practice, which can be proven through discovery, Plaintiff was decieved and invidiously discriminated against.

17. In between 2022 and 2023, Plaintiff obtained the Philadelphia Inquirer and noticed BBU's advertisement regarding, inter alia, its statement savings account product and its high interest rates.

18. In February 2023, Plaintiff had wrote the BBU in an attempt to do business with them, requesting information on how to open up an account to earn interest.

19. On February 28, 2023, Mr. Cortez had sent Plaintiff a reply letter, directing him to fill out and send back the enclosed application, a copy of his current ID/DL, and a check.

20. Mr. Cortez's reply letter had additionally established a mutual agreement to do business with Plaintiff by representing and promising him that:

   A. once funds had arrived at its King of Prussia office, new account documents would be prepared and mailed to him within 3 to 5 business days; and
   
   B. he would begin to earn interest on the date that his funds were received.

21. This agreement created an obligation upon Defendants to fulfill it's aforementioned promises in good faith, and not have his race be a factor in the execution thereof.

22. Plaintiffs' account option on Defendants' application was a state-

ment savings account, to which it promised an annual percentage yield/interest rate of 0.21%, in exchange for $500.00.

23. At this juncture, the Defendants had absolutely no knowledge of the Plaintiffs' race or color.

24. In accordance with Defendants' aforesaid advertisement, representation, and in conformity with their preliminary agreement, on April 4, 2023, Plaintiff mailed Defendants a check for $500.00, along with the completed application and a copies of his most current ID, which was an expired non-drivers license, and ID from the Pennsylvania State Police which could readily be verified.

25. However, upon receiving the Plaintiffs' picture ID, and other materials considered in the aforesaid preliminary agreement, and in conformity with its aforesaid practice of disproportionately discriminating against people of color in the opening of statement savings accounts, on April 10, 2023, Mr. Cortez had returned those materials back to Plaintiff, and without explanation, told Plaintiff that him and the BBU would not open up an account for him.

26. As aforesaid, this rejection did not come with an explanation, and if Plaintiffs' ID was an issue, Mr. Cortez could have easily addressed that in the letter, but, since he didn't, it is apparent that Plaintiffs' expiration date on the ID wasn't what rejected his application, but, his photograph showing a person of color.

27. Under the Securities Exchange Act, a security includes, but not limited to, a financial asset such as shares, government

stocks, debentures, bonds, unit trusts, and rights to money lent or deposited. It does not, however, include insurance policies. See: The Oxford Dictionary of Finance and Banking, Sixth Edition (2018).

28. Accordingly, funds being deposited into Defendants' statement savings accounts are considered asset-backed funds, because it is money invested in BBU's corporate assets, and are not covered by BBU's insurance contract with the FDIC.

29. BBU receives Federal financial assistance in its own corporate assets, to which statement savings accounts generate funds to maximize the return on its own investments in the stock market.

30. However, the Defendants had used this federally financed product in a manner that established a practice of racial disparity, and as a result thereof, Plaintiff was denied an opportunity to have their contract carried out in order to begin earning interest.

31. As a proximate result of the Defendants' acts and omissions:
   A. Plaintiff was deceived.
   B. Plaintiff was discriminated because of his race.
   C. Plaintiff was denied an annual interest rate of 0.21%.
   D. Plaintiff was traumatized, suffering from emotional and mental distress.

Count One. False Advertising Violation Under The Pennsylvania Unfair Trade Practices And Consumer Protection Law, 73 Pa. Cons. Stat., section 201-1 et seq:

32. As aforementioned, the Defendants had, and maintained a marketing

scheme, to advertise its statement savings account product, as if it were neutrally available, equally, to the public.

33. This practice was to deceive the public and Federal regulators like the Securities and Exchange Commission.

34. Had the public and Securities and Exchange Commission been aware of Defendants' deception, it's unlawful marketing practices would have been exposed and people would stop doing business with them.

35. The Defendants' aforesaid marketing scheme affects interstate commerce.

36. Such marketing scheme had actually deceived Plaintiff and caused him to suffer financially and mentally.

WHEREFORE, Plaintiff demands judgment against Defendants for an amount in excess of $75,000.00, punitive damages, costs, and fees.

Count Two - Fraudulent Misrepresentation:

37. As aforementioned, Mr. Cortez, through written correspondence, had represented to Plaintiff that, once his funds, application, and ID/DL was received that new account documents would be prepared and mailed to him within 3 to 5 business days, and that he would begin to earn interest on the date that his funds were received.

38. This representation was material to a binding financial transaction between the Plaintiff and Defendants to which Plaintiff relied on.

39. In reliance of this representation, and in an attempt to finalize the aforesaid financial transaction, Plaintiff sent Mr. Cortez his personal ID and funds in belief that a new account would be opened, with interest accruing on that account immediately.

40. However, the Defendants' aforementioned marketing scheme caused for Mr. Cortez to surreptitiously seek to find out what race Plaintiff was, and upon realizing that he was a person of color, Mr. Cortez denied his application and caused Plaintiff to be deceived.

WHEREFORE, Plaintiff demands judgment against Mr. Cortez for an amount in excess of $75,000.00, punitive damages, costs, and fees.

Count Three - Violations of the Civil Rights Act of 1964:

41. Pursuant to 42 USC Section 2000d, it provides: "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance". 42 USC Section 2000d.

42. As aforementioned, the BBU receives Federal financial assistance for its own corporate assets, to which statement savings accounts generate funds to maximize the return on its own investments in the stock market.

43. This is why the interest rates on these accounts is so high and rewarding.

44. However, the BBU, by and through its aforesaid marketing scheme, purposefully caused Plaintiff to be discriminated against, due to his race, and be denied access to the company's statement savings account product.

WHEREFORE, Plaintiff demands judgment against BBU for an amount in excess of $75,000.00, punitive damages, costs, and fees.

Count Four · Violations of Title 42 USC Section 1981:

45. Pursuant to 42 USC Section 1981, it provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 USC Section 1981.

46. As aforementioned, Plaintiff and Mr. Cortez had entered into a preliminary agreement, through correspondence, and through considerations made on Mr. Cortez's promises.

47. However, upon acknowledging Plaintiff as being a person of color in his ID, and staying in compliance with BBU's aforesaid marketing scheme to attract white citizens and weed out blacks, Mr. Cortez had renounced their deal and refused to uphold his promise.

WHEREFORE, Plaintiff demands judgment against Mr. Cortez for an amount in excess of $75,000.00, punitive damages, costs, and fees.

Count Five · Violations of Title 42 USC Section 1985 (3):

48. It is clear from the facts stated, that, the BBU, Mr. Cortez, and all of its corporate shareholders had established and maintained a widespread national conspiracy of using its aforesaid marketing scheme to discriminate, and disproportionately provide its statement savings account products to white citizens.

49. As a result thereof, Plaintiff was deprived equal access to their interest bearing account product as white citizens.

WHEREFORE, Plaintiff demands judgment against Defendants for an amount

in excess of $75,000.00, punitive damages, costs, and fees.

Count Six: Breach of Implied Contract:

50. As aforementioned, Plaintiff and Defendants had entered into a preliminary agreement.
51. Defendants mailed Plaintiff documents for consideration of opening an interest-bearing account, and upon considering each aspect of what Defendants were offering and promising, Plaintiff agreed to do business by returning all materials requested.
52. Such aforesaid mutual obligations created an enforceable contract.
53. However, upon receiving Plaintiffs' aforesaid materials, Defendants had renounced the deal and refused to uphold their promise that Mr. Cortez had put in writing.
54. As a result, Plaintiffs' $500.00 lost its ability to obtain an annual percentage interest rate of 0.21%.

WHEREFORE, Plaintiff demands judgment against Defendants for an amount in excess of $75,000.00, punitive damages, costs, and fees.

Count Seven: Vicarious Liability:

55. As principal, BBU is liable to Plaintiff for all of the aforementioned frauds, deceits, concealments, misrepresentations, torts, negligent acts, and/or, other malfeasances of Mr. Cortez.

WHEREFORE, Plaintiff demands judgment against BBU for an amount in excess of $75,000.00, punitive damages, costs, and fees.

Verification:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. 28 USCS 1746.

Respectfully submitted,

Charles P.E. Talbert
Legal Assistant - Paralegal

August 30, 2023

SCI. Forest
289 Woodland Drive
Marienville, PA 16239

Charles Talbert
No. QA4727
SCI. Forest
289 Woodland Drive
Marienville, PA, 16239

LEGAL MAIL

INMATE MAIL

TO: Mr. George Wylesol, Clerk
U.S. Courthouse - Eastern
Room 2609
601 Market Street
Philadelphia, PA, 19106